IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
CAROL CURTIS, on behalf of herself )
and others similarly situated,     )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )       1:09CV740
                                   )
MERRILL LYNCH PIERCE FENNER &      )
SMITH, INC.,                       )
                                   )
                    Defendant.     )
```

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the Court for a recommended ruling on Defendant's Motion to Dismiss (Docket Entry 5), pursuant to this Court's Amended Standing Order 30. (See Docket Entries dated Sept. 28, 2009, and Mar. 10, 2010; see also Fed. R. Civ. P. 72(b)(1).) For the reasons that follow, said motion should be denied in part and deferred in part.

BACKGROUND

On September 28, 2009, Plaintiff filed a putative class action Complaint in this Court asserting claims against Defendant under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., or, in the alternative, under North Carolina state law, related to Defendant's alleged mishandling of assets in an employment-based retirement plan ("the Plan") in which Plaintiff had an interest. (Docket Entry 1.) The Complaint includes the following noteworthy allegations:

1) Defendant "managed the Plan assets as a single fund during the entire relevant period, ending in September 2006" (id. at ¶ 25);

2) the Plan's written "Funding Policy and Method" reflected that "the principal goal of the investment of the funds in the [P]lan should be both security and long-term stability with moderate growth commensurate with the anticipated retirement dates of participants" and that "[i]nvestments, other than 'fixed dollar' investments, should be included among the [P]lan's investments to prevent erosion by inflation" (id. at ¶ 26 (emphasis added));

3) Defendant "did not invest for 'security and long-term stability with moderate growth' commensurate with participants' anticipated retirement dates . . .[,] did not perform any analysis of the investment goals and needs of the Plan or its participants . . .[, and] did not construct or offer an appropriately prudent 'total return' portfolio consistent with the Plan's funding policy" (id. at ¶ 29 (emphasis added));

4) "contrary to the Plan's instructions and without knowing consent from the trustees, [Defendant] pursued its own aggressive and speculative preferences" (id. (emphasis added));

5) Defendant "failed to diversify the Plan's investments across different asset classes, and across industry sectors or other risk factors within each asset class . . .[,] concentrated the Plan's assets into equities, which averaged 97% of the Plan's

assets, until January 2006 . . .[, and,] [c]ontrary to the Plan's 'Funding Policy and Method,' . . . made no allocation to 'fixed dollar' investments or securities whose primary characteristics are 'security and long-term stability'" (id. at ¶¶ 31-32 (emphasis added));

6) "[o]verconcentration in technology stocks averaged over 50% at least through June 2005 . . . [and] ranged from 50% up to 80% of the individual holdings from May 1998 to February 2002" (id. at ¶ 33);

7) "[m]utual funds were a small portion of [Defendant's] asset management . . . [and] [t]he mutual funds that [Defendant] bought and sold [for the Plan] mirrored [Defendant's] preferences for technology stocks and aggressive growth" (id. at ¶ 35);

8) Defendant "speculated with the Plan's assets by writing out-of-the-money calls against volatile stocks . . . not [as] a hedge or risk management strategy but . . . [rather in a manner that] was imprudent for the Plan's account" (id. at ¶ 36);

9) Defendant "deliberately exposed the Plan's assets to high volatility and uncompensated risks . . . [and] failed to manage those risks and protect the Plan against . . . losses [that] were far worse than a broadly diversified portfolio or otherwise risk-managed portfolio would have experienced" (id. at ¶ 41 (emphasis added));

10) Defendant "sat paralyzed as the tech holdings imploded[,] . . . did nothing meaningful to preserve the Plan's gains or protect its principal . . . [, and,] [a]ll the way down, . . . reassured participants that [Defendant] had positioned everything correctly" (id. at ¶ 42);

11) "[w]hen the stock market was going up, [Defendant] told [a Plan trustee] and the Plan's participants that portfolio gains were the result of [Defendant's] market acumen . . .[, but] <u>[w]hen the Plan lost most of its assets in 2000 through 2002, [Defendant] blamed 'the market' for the losses . . .[,] hid its imprudent risk-taking and failure to apply risk management . . .[, and] claimed (falsely) that it could not have known about the dangers of its investment strategy or protected the Plan against its large losses</u> . . . [in statements to the Plan trustees and] to rank and file Plan participants at periodic meetings" (id. at ¶¶ 45-47 (emphasis added));

12) Defendant "knowingly misrepresented the causes of the Plan's losses and misled Plan participants . . .[,] <u>deliberately conceal[ed] that it had exposed the Plan to excess risks that it left unprotected</u>[,] and g[ave] repeated false reassurances that everything was correctly positioned, [all in a manner that] <u>prevented [Plan trustees] and other Plan participants from discovering [Defendant's] breaches</u> and protecting the Plan and participants' interests" (id. at ¶ 48 (emphasis added));

-4-

13) "[s]tarting in September 2005, [two former trustees of the Plan] began to discover that the representations and assurances they had received for many years from [Defendant] were untrue[,] . . . investigation ultimately revealed that [Defendant] had mismanaged the Plan's investments[,] . . . [and the two former trustees] also discovered that [Defendant] had misrepresented its investment strategy, the risks to which it exposed the Plan, and the causes of the Plan's losses" (id. at ¶ 53 (emphasis added)); and

14) "[f]ollowing diligent investigation, [the two former trustees] instituted an arbitration proceeding against [Defendant] in June 2007, seeking recovery on behalf of the Plan and all of its affected participants and beneficiaries" (id. at ¶ 54 (emphasis added)); and

15) "the arbitrators ruled on February 27, 2009 that the proceeding could continue only as to the personal claims of [the two former trustees:] 'These claimants may proceed in their individual capacities and not as a trustees [sic] or on behalf of any other person or entity'" (id. at ¶ 59).

Defendant moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and filed a supporting brief. (Docket Entries 5, 6.) Plaintiff responded in opposition and Defendant replied. (Docket Entries 11, 15.)

DISCUSSION

Defendant bases its Motion to Dismiss entirely on the assertion that "[a]ll of Plaintiff's claims are barred by the applicable limitations period." (Docket Entry 5 at 1.) "The raising of the statute of limitations as a bar to [a] cause of action constitutes an affirmative defense and may be raised by motion pursuant to Fed. R. Civ. P. 12(b)(6), <u>if the time bar is apparent on the face of the complaint</u>." <u>Dean v. Pilgrim's Pride Corp.</u>, 395 F.3d 471, 474 (4th Cir. 2005) (emphasis added). To resolve the instant motion, the Court thus must decide if the Complaint facially shows the untimeliness of Plaintiff's claim(s).

As noted above in the Background section, Plaintiff commenced this action on September 28, 2009. Further, the parties agree (albeit somewhat disagreeably) (<u>see</u> Docket Entry 6 at 4-5; Docket Entry 11 at 8-9 & n.7)[1] that the following statute of limitations applies to Plaintiff's ERISA claim(s):

---

[1] The Court notes that both parties' briefs have employed somewhat inflammatory language, including regarding matters not directly related to the issues presented. (<u>Compare, e.g.</u>, Docket Entry 6 at 1 ("The instant action is a shameful example of forum-shopping.") <u>with</u> Docket Entry 11 at 12 ("[Defendant] knows these facts, yet inexplicably misrepresents material information in its brief.").) The Court recognizes that emotions often run high during litigation, but asks the parties and their counsel to resist the temptation to engage in excesses of this (or any other) sort during the further conduct of this case. <u>See generally</u> <u>Mecklenburg Farm v. Anheuser-Busch, Inc.</u>, 250 F.R.D. 414, 420 (E.D. Mo. 2008) ("The Court requests the parties to endeavor to maintain civility and decorum in future filings, and to refrain from using the type of overheated rhetoric which has appeared in filings by both sides. Such comments are of no use to the Court in resolving the issues presented by this case, and serve only to detract from the dignity of the proceedings and the persuasiveness of the makers' arguments.").

> [T]he earlier of:
>
> (1) <u>six years after</u> (A) <u>the date of the last action which constituted a part of the breach or violation</u>, or (B) in the case of an omission the later date on which the fiduciary could have cured the breach or violation, <u>or</u>
> (2) <u>three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation</u>;
>
> <u>except that in the case of fraud or concealment</u>, such action may be commenced <u>not later than six years after the date of discovery of such breach or violation</u>.

29 U.S.C. § 1113 (emphasis added). Accordingly, as an initial matter, the Court should determine whether the allegations in the Complaint confirm that Plaintiff "had actual knowledge of the breach or violation" before September 28, 2006, the earliest possible time bar under Section 1113.[2]

Defendant answers this question in the affirmative through a two-step process. First, Defendant asserts that "[t]he essence of Plaintiff's ERISA claim is simply this: [Defendant] did not protect Plaintiff's money." (Docket Entry 6 at 5.) Second, Defendant contends that "[i]t is clear from the face of the Complaint that Plaintiff knew of this alleged violation – that is, the losses – prior to September 28, 2006." (<u>Id.</u> at 6.) The logic of this analysis rests on an unsound foundation; specifically, although Plaintiff's ERISA claim(s) may revolve to a large degree around the fact that losses occurred, the Complaint (as documented above in

---

[2] In other words, only if the Court finds that the Complaint reflects such actual knowledge within the three-year limitations period would it need to consider whether the Complaint's allegations trigger the six-year time bar.

-7-

the Background section) also includes substantial allegations that the "breach or violation," 29 U.S.C. § 1113(2), consisted largely of Defendant's failure to follow the Plan's written directives regarding investments.

As a result, even if the Complaint makes clear that Plaintiff had actual knowledge of the Plan's losses prior to September 28, 2006, Defendant's limitations attack on her ERISA claim(s) fails because the Complaint does not facially establish that Plaintiff had actual knowledge of Defendant's alleged disregard of the Plan's investment guidelines before that date. To the contrary, the Complaint alleges that, even as the complained-of losses became evident, Defendant "deliberately conceal[ed] that it had exposed the Plan to excess risks" in a manner that kept "Plan participants from discovering [Defendant's] breaches" (Docket Entry 1 at ¶ 48). Moreover, the Complaint asserts that only during an investigation commenced in or around September 2005 and completed by June 2007 (a time period that extends beyond September 28, 2006) did Defendant's "mismanag[ment] [of] the Plan's investments" and "misrepresent[ation] [of] its investment strategy, the risks to which it exposed the Plan, and the causes of the Plan's losses" come to light (id. at ¶¶ 53-54).

In other words, Defendant's alleged failure to heed the prescriptions of the Plan's written investment regimen represents a "breach or violation," 29 U.S.C. § 1113(2), about which Plaintiff

complains and the Complaint does not foreclose a finding that Plaintiff lacked knowledge of such conduct until on or after September 28, 2006.[3] These considerations doom Defendant's instant call for dismissal of Plaintiff's ERISA claims at the pleading stage under any recognized judicial construction of Section 1113(2)'s "actual knowledge" standard. See Browning v. Tiger's Eye Benefits Consulting, 313 Fed. Appx. 656, 661 (4th Cir. 2009) (discussing circuit split, noting that Fourth Circuit "has not had occasion to precisely define 'actual knowledge of the breach or violation' under section [1113(2)]," and declining to "settle on a hard and fast definition," but observing that, at a minimum, said phrase requires a showing that the plaintiff "knows the essential facts of the transaction or conduct constituting the violation" (internal quotation marks omitted)).

---

[3] Defendant endeavors to avoid the latter conclusion by asserting that "Plaintiff **had** to know that [Defendant] made investments that were allegedly risky, because by definition non-risky investments do not lose "'more than 50% and 75% of their value.'" (Docket Entry 6 at 7 (emphasis in original) (quoting Docket Entry 1 at ¶ 44).) This argument lacks persuasive force for several reasons. First, Defendant's alleged "breach or violation" did not involve simply making some "risky" investments, but rather consisted of neglecting to "invest for 'security and long-term stability with moderate growth'" as dictated by the Plan's written policy (Docket Entry 1 at ¶ 29) and "deliberately expos[ing] the Plan's assets to high volatility and uncompensated risks . . . [while] fail[ing] to manage those risks and protect the Plan against . . . losses [that] were far worse than a broadly diversified portfolio or otherwise risk-managed portfolio would have experienced" (id. at ¶ 41). Second, the Complaint expressly alleges that, "[w]hen the Plan lost most of its assets in 2000 through 2002, [Defendant] blamed 'the market' for the losses . . . [and] hid its imprudent risk-taking and failure to apply risk management" (id. at ¶ 46). This allegation supports an inference contrary to that urged by Defendant, namely that (due to Defendant's misconduct) Plaintiff reasonably did not conclude that the Plan's losses resulted because Defendant made "risky" investments, but rather arose from unforeseeable forces that dramatically affected even prudent investors. Third, the postulate that "non-risky investments do not lose 'more than 50% and 75% of their value'" (Docket Entry 6 at 7) strikes the Court as a debatable factual matter unsuited to judicial resolution in Defendant's favor at this stage of the proceedings.

In sum, the Complaint does not establish as a matter of law that Plaintiff had actual knowledge prior to September 28, 2006, of any "breach or violation," 29 U.S.C. § 1113(2), involving Defendant's alleged failure to follow the Plan's investment protocol. The Court should deny Defendant's motion for dismissal of Plaintiff's ERISA claim(s) on this basis. In light of this proposed disposition, the Court need not resolve the difficult issues regarding equitable tolling raised by Plaintiff as an alternative defense to Defendant's instant motion (see Docket Entry 6 at 9-10; Docket Entry 11 at 13-19; Docket Entry 15 at 7-10).

As a final matter, Defendant also moves to dismiss Plaintiff's state law claims on limitations grounds. (See Docket Entry 6 at 8-9.) The Court should defer that aspect of the instant motion until summary judgment or trial for at least three reasons. First, Plaintiff has pleaded state law claims only as an alternative in the event the Court determines that ERISA does not apply (a circumstance unmet or even forecast at this time). Second, the presence of this alternative state-law theory of recovery would not appear to require discovery beyond that warranted by the surviving ERISA claim(s). Third, further factual development and/or briefing (including as to whether equitable tolling principles would apply to such state law claims) would aid the Court's handling of this matter should it become necessary.

The Federal Rules of Civil Procedure specifically contemplate action of this sort. See Fed. R. Civ. P. 12(i) (authorizing courts to order "deferral" of motions to dismiss "until trial"); see also Fed. R. Civ. P. 12(a)(4) (providing that, "if the court denies [a motion under Fed. R. Civ. P. 12] or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action"). Moreover, a number of different members of this Court have endorsed this approach in comparable contexts. See Duke Univ. v. Massey Energy Co., No. 1:08CV591, 2009 WL 4823361, at *2 (M.D.N.C. Dec. 9, 2009) (unpublished) (Sharp, M.J.) ("[T]he Court determines in its discretion and in the interest of judicial management that ruling on the pending motion to dismiss filed by Defendants should be deferred and postponed until the time of trial or a ruling on any motion for summary judgment filed by Defendant, whichever first occurs. All arguments for judgment now appearing in the motion to dismiss should be folded into any summary judgment motion and brief." (internal citations omitted) (citing Fed. R. Civ. P. 12(a)(4)(A) and 12(i) and M.D.N.C. R. 56.1(a) and (b))); Slate v. Potter, No. 1:04CV782, 2005 WL 2429877, at *1-2 (M.D.N.C. Sept. 29, 2005) (unpublished) (Beaty, J., adopting recommendation of Sharp, M.J.) (denying motion to dismiss without prejudice to reconsideration after completion of discovery because "[s]ome of Defendant's arguments . . . may be more thoroughly examined and accurately determined on a developed

record" (citing provision of Fed. R. Civ. P. 12 now codified at subsection (i))); Food Lion, Inc. v. Capital Cities/ABC, Inc., 887 F. Supp. 811, 820 (M.D.N.C. 1995) (Tilley, J.) ("Magistrate Judge [P. Trevor Sharp] has recommended that the motion to dismiss claims Two, Four, Five, and Eight . . . be deferred pursuant to [the provision of Fed. R. Civ. P. 12 now codified at subsection (i)]. The Court adopts this recommendation."); Flue-Cured Tobacco Coop. Stabilization Corp. v. United States Envtl. Prot. Agency, 857 F. Supp. 1137, 1145 (M.D.N.C. 1994) (Osteen, Sr., J.) ("The determination of the legal sufficiency of Plaintiff's claim [in Count IV] should be deferred until the next dispositive stage of litigation. This claim can be adjudicated more accurately after the parties have developed the factual record. The pendency of this claim will not significantly affect the scope of discovery that will be permitted on the claims that have been found to state a legal cause of action." (internal citations omitted) (citing provision of Fed. R. Civ. P. 12 now codified at subsection (i))).

## **CONCLUSION**

Defendant's motion for dismissal of Plaintiff's ERISA claim(s) on statute of limitations grounds fails because, even if one excludes equitable tolling considerations and utilizes only the three-year (rather than the potentially-applicable six-year) limitations period, Defendant has not shown that "the time bar is apparent on the face of the [C]omplaint." Dean, 395 F.3d at 474.

Moreover, given that the case should proceed as to the ERISA claim(s), that discovery on those claim(s) should overlap with any discovery on Plaintiff's state law claims, and that the alternative nature of those state law claims may make any scrutiny of them moot, the Court should defer consideration of Defendant's argument for dismissal of Plaintiff's state law claims until the close of discovery and/or trial in the interest of sound case management.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion to Dismiss (Docket Entry 5) be **DENIED** as to Plaintiff's ERISA claim(s) and **DEFERRED** as to Plaintiff's alternative state law claims, while this case proceeds to an Initial Pretrial Conference and discovery.

                                                /s/ L. Patrick Auld
                                                      **L. Patrick Auld**
                                      **United States Magistrate Judge**
September 9, 2010